## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

RACHEL M. THOMPSON,                    CASE NO.: 2:16-cv-00734-GCS-KAJ

On Behalf of Herself and Others Similarly
Situated,

                    Plaintiff,

        vs.

GENERAL REVENUE CORPORATION,

                    Defendant.

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### I.     INTRODUCTION

Rachel M. Thompson ("Plaintiff") alleges in her Amended Class Action Complaint that General Revenue Corporation ("GRC") violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. by sending a dunning letter seeking to collect a debt owed to Columbus State Community College ("Columbus State") that included $439.07 in collection costs assessed by the Office of the Ohio Attorney General ("OAG"). (Amended Compl. [Doc. No. 2] ¶¶ 29-35, 41-43.) Plaintiff alleges that GRC "was not legally entitled to collect any collection costs on the debt, under Ohio law or otherwise." (*Id*. ¶ 21). Alternatively, Plaintiff asserts that even if GRC was legally entitled to collect certain collection costs, $439.07 "was excessive and not authorized by law or otherwise." (*Id*. ¶ 22.)

Plaintiff filed a motion to for class certification on June 29, 2019 [Doc. No. 48]. GRC respectfully requests that the Court deny Plaintiff's motion because Plaintiff has failed to present

1

the Court with evidence demonstrating that all requirements of Rule 23 have been satisfied.

## II.    FACTS

### A.    Background

Plaintiff incurred a debt to Columbus State Community College ("Columbus State") in 2014, in the amount of $959.00.  (Affidavit of Daniel A. Tharp ¶ 4.)  As a result of Plaintiff's failure to repay the debt to Columbus State, the debt was certified to the OAG pursuant to Ohio Rev. Code § 131.02.  (*Id.* ¶ 5.)  Because the OAG's efforts to collect Plaintiff's debt were unsuccessful, the OAG referred the debt to GRC for collection on or about July 29, 2015.  (*Id.* ¶ 5.)

When the debt was placed with GRC for collection, the OAG represented to GRC that the balance of Plaintiff's debt was $1,416.36, which consisted of a principal balance of $959.00, interest in the amount of $18.29, and a collection costs in the amount of $439.07.  (Affidavit of Zenon Butts ¶ 5.)  GRC sent a letter to Plaintiff on July 31, 2015 describing the balance that it had been retained to collect.  (Pl.'s Mot. for Class Cert. Ex. F.)  Plaintiff's debt was recalled from GRC on or about April 25, 2016, at which point the debt remained unpaid.  (Tharp Aff. ¶ 7; Butts Aff. ¶ 6.)

Plaintiff's debt was resolved on August 17, 2016, by way of a credit card payment in the amount of $1,250.98 made via the OAG's online payment portal.  (Tharp Aff. ¶ 8.)  The amount paid to resolve Plaintiff's debt consisted of a principal balance of $903.00, interest in the amount of $47.65, and collection costs in the amount of $300.33.  (*Id.*)

### B.    Procedural Posture

Plaintiff filed this lawsuit on July 27, 2016, alleging that GRC's attempt to collect the balance that the OAG retained GRC to collect violated the FDCPA.  (Am. Compl. ¶¶ 28-62.)  GRC

answered Plaintiff's Amended Complaint and then moved for judgment on the pleadings [Doc. Nos. 3, 5].

GRC's motion asserted that the letter to Plaintiff was not false, deceptive, or misleading because Ohio law provided the OAG with authority to assess collection costs to the amount certified by Columbus State.  Alternatively, GRC argued that it was entitled to judgment on the pleadings because it was entitled to rely on the information supplied to it by the OAG—that is, GRC's description of the amount of the debt was not false, deceptive, or misleading because it accurately reflected the amount that GRC's client, the OAG, sought to collect from Plaintiff.  The Court denied GRC's motion for judgment on the pleadings on August 2, 2017, finding that "both parties presented reasonable but not unambiguous readings of [Ohio Rev. Code § 131.02], and thus, …. [that] the statute is ambiguous"  [Doc. No. 27].

Plaintiff filed a motion for class certification on June 29, 2019 [Doc. No. 48].

## III. LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only" and that in order to "justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)).  The party seeking class certification bears the burden of showing that the requirements of Rule 23 are satisfied. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013).  Thus, Plaintiff must demonstrate that the requirements of numerosity, commonality, typicality, and adequacy of

4795265v4

representation are met under Rule 23(a), and also that the putative class falls within one of the three categories set forth in Rule 23(b).  *Dukes*, 131 S.Ct. at 2550; *Amchem*, 521 U.S. at 613–14.

Rule 23(b)(3) requires that the Court find ". . . that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3) classes must also meet "an implied ascertainability requirement." *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017).  In order to meet the ascertainability requirement, "a `class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *Id*. at 471 (citing *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-538 (6th Cir. 2012)).

Evidentiary proof is required to show that Rule 23 is satisfied.  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting *Dukes*, 131 S.Ct. at 2551–52).  The party seeking class certification must prove compliance by a preponderance of the evidence.  *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir.2013).  A rigorous analysis and consideration of the factual and legal issues comprising the plaintiff's cause of action are necessary to determine whether Rule 23 is satisfied. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160–161 (1982); *see also Comcast*, 133 S.Ct. at 1432.

## IV.    ARGUMENT

### A.    The proposed classes are not sufficiently ascertainable.

At the outset, the Court must determine whether the class definition is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012).

4

"For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Id.* at 538 (internal quotation omitted). The "touchstone of ascertainability is whether the class is objectively defined, so that it does not implicate the merits of the case or call for individualized assessments to determine class membership." *Stewart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008). If a court must engage in individualized fact-finding to determine class membership, a class cannot be certified. *See Romberio v. UNUMProvident Corp.*, 385 F.App'x 423, 431 (6th Cir. 2009); *Barrett v. ADT Corp.*, No. 2:15-cv-1348, 2016 U.S. Dist. LEXIS 28767, *23 (S.D. Ohio Mar. 7, 2016).

Plaintiff's proposes two separate classes. The first class consists of:

> All persons to whom Defendant mailed at least one written communication dated July 27, 2014 to the present; to collect a non-tax debt owed to the State of Ohio and/or its related entities, which debt was referred to Defendant for collection by the Ohio Attorney General ("OAG") pursuant to a Third Party Collection Vendor Agreement; and in which Defendant sought to recover "collection costs" pursuant to (former) Ohio Revised Code §§109.081 and 131.02. Specifically excepted from this Class are all persons to whom Defendant mailed written communications relating to any accounts placed with Defendant for collection of debts incurred after April 5, 2017, and/or for all accounts placed with Defendant for debts that were not incurred for personal, family or household purposes.

The second class consists of:

> All persons to whom Defendant mailed at least one written communication dated July 27, 2014 to the present; to collect a non-tax debt owed to the State of Ohio and/or its related entities, which debt was referred to Defendant for collection by the Ohio Attorney General ("OAG") pursuant to a Third Party Collection Vendor Agreement; and in which Defendant sought to recover "collection costs" pursuant to (former) Ohio Revised Code §§109.081 and 131.02; and after which resulted in any payment from such persons of any funds applied to "collection costs". Specifically excepted from this Class are all persons to whom Defendant mailed written

> communications relating to any accounts placed with Defendant for
> collection of debts incurred after April 5, 2017, and/or for all
> accounts placed with Defendant for debts that were not incurred for
> personal, family or household purposes[.]

(Pl.'s Memo. in Supp. of Mot. for Class Cert. at 5-6.)  Plaintiff's proposed classes are not sufficiently defined, and extensive individualized fact-finding would be necessary to determine class membership.

### 1.  The proposed classes are not sufficiently defined.

The proposed classes contain no definitive temporal limit.  Plaintiff's Amended Complaint seeks to certify a single class consisting of individuals who were sent a collection letter between July 27, 2015 and, apparently, the date of the Amended Complaint.  (*See* Am. Compl. ¶ 39.)  Now, in her motion for class certification, Plaintiff proposes <u>two</u> classes, each consisting of individuals who were sent a collection letter between July 27, <u>2014</u> and "the present."  (Pl.'s Memo. in Supp. of Mot. for Class Cert. at 5-6.)  Given that the temporal scope of the proposed classes is not limited to letters sent between two particular dates, it is impossible to determine whether any particular individual is a member of the proposed classes.

Further, the claims of individuals who received a collection letter from GRC prior to July 27, 2015 are barred by the FDCPA's one-year statute of limitations.  *See* 15 U.S.C. § 1692k(d).  As a result, the classes proposed by Plaintiff are fatally overbroad.

Plaintiff also fails to suggest, much less demonstrate by a preponderance of the evidence, that there is an administratively feasible way to determine whether each of the more than 40,000 debts potentially at issue was "incurred for personal, family or household purposes."  (*See* Pl.'s Memo. in Supp. of Mot. for Class Cert. at 21-22.)

Finally, Plaintiff fails to demonstrate that she is a member of each of the proposed classes.  The second proposed class is distinguishable from the first in that it purports to include those

individuals who actually paid collection costs to GRC after receiving a collection letter from GRC.[1]  However, Plaintiff did not make any payment to GRC, let alone pay collection costs to GRC.  Plaintiff resolved her debt by making a payment directly to the OAG on August 16, 2016, long after GRC's file for Plaintiff was closed and returned to the OAG. (Tharp Aff. ¶ 7.)  Since Plaintiff is not a member of the second proposed class, she lacks standing to represent it.  *See Heard v. Mueller Co.*, 464 F.2d 190, 194 (6th Cir. 1972) (certification is not appropriate if the named plaintiff is not a member of the class).

### 2.  Determining class membership would require extensive individualized fact-finding.

Plaintiff's proposed class definitions are insufficient insofar as they fail to exclude those individuals who cannot maintain the claims asserted in this case due to claim preclusion or under the "collateral attack" doctrine.  "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).  Under Ohio law, the claim preclusion doctrine provides that a "valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action."  *Grava v. Parkman Township*, 73 Ohio St.3d 379, 382, 653 N.E.2d 226 (1995) (describing the elements of res judicata, including claim preclusion).[2]

---

[1] To the extent the second class consists of individuals who paid collection costs to anyone after receiving a letter from GRC (as opposed to just those individuals who paid collection costs to GRC), the class cannot be certified because Plaintiff has failed to demonstrate that there is an administratively feasible method for identifying individuals who paid collection costs to a party other than GRC.

[2] *See also Hapgood v. City of Warren*, 127 F.3d 490, 493 (6th Cir.1997) (stating that the four elements of claim preclusion under Ohio law are "(1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies,

4795265v4

The collateral attack doctrine limits the ability of one court to render a decision that undermines the validity of the judgment of another court to very limited circumstances, such as those involving fraud or lack of personal jurisdiction.  *Ohio Pyro, Inc. v. Ohio Dep't of Commerce*, 115 Ohio St.3d 375, 875 N.E.2d 550 (2007).  "[A] collateral attack on a judgment is actually an attack on the integrity of the judgment. The merits of the previous judgment are not at issue in such a situation — only the fundamental validity of the previous judgment is at issue."  *Id*. at 380.

The claims in this matter stem from Plaintiff's assertion that GRC violated the FDCPA by falsely, deceptively, or misleadingly representing that the putative class members' debts included collection costs assessed by the OAG.  The OAG routinely recalls unpaid debts from GRC and appoints special counsel to pursue legal remedies with respect to the debts.  (Tharp Aff. ¶ 9.) According to the OAG, it is likely that a judgment was entered with respect to the debts of a number of the putative class members and that such judgments include the collection costs upon which Plaintiff's claims are based.  (*Id*. ¶ 10.)

Given that the relief sought by Plaintiff—a decision that the putative class members did not owe the collection costs that GRC attempted to collect and disgorgement of amounts that may have already been recovered pursuant to valid judgments—would undermine the fundamental validity of, if not invalidate or contradict, those judgments, such individuals against whom judgments have been entered must be excluded from any class.  *See Frazier v. Matrix Acquisitions, LLC*, 873 F.Supp. 2d 897, 905 (N.D. Oh. 2012) (granting summary judgment in favor of a debt

---

as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action.") (citation omitted); *ABS Industries, Inc. ex rel. ABS Litigation Trust v. Fifth Third Bank*, 333 Fed. Appx. 994, 999 (2009) ("[I]t is well settled that a principal-agent relationship satisfies the privity requirement of res judicata where the claims alleged are within the scope of the agency relationship.").

collector where claims under the FDCPA constituted a collateral attack on a state court judgment); *Brown v. Fla. Coastal Partners, LLC*, 2:13-CV-1225, 2016 WL 498904, at *4 (S.D. Ohio Feb. 9, 2016) (holding that FDCPA claims based on allegedly false and deceptive representations made with respect to the balance of a debt were barred by the collateral attack doctrine); *State ex rel. Swanson v. Messerli and Kramer, P.A.*, A08-0415, 2009 WL 1046869, at *3 (Minn. App. Apr. 21, 2009) (holding that claims based on debt collector's alleged attempt to collect unlawful amount of attorneys' fees were barred by the collateral attack doctrine because a state court confirmed the validity of the attorneys' fees sought by the debt collector by reducing them to judgments).

Plaintiff fails to suggest, much less demonstrate by a preponderance of the evidence, that there is an administratively feasible method for identifying those individuals who must be excluded from the proposed classes as a result of judgments. At the very least, Plaintiff's proposed class definitions would require extensive individualized fact-finding by the Court. The OAG attests that it would be "exceedingly burdensome" to identify those putative class members whose claims are barred by *res judicata* or under the collateral attack doctrine. (Tharp Aff. ¶ 11.) The OAG estimates that it would take 15 to 30 minutes to make such a determination for each putative class member, which equates to roughly 10,000 to 20,000 hours in total. (*Id.*).

Because the proposed classes are not sufficiently defined and Plaintiff has failed to demonstrate by a preponderance of the evidence that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed classes, Plaintiff's motion for class certification must be denied.

### B. Plaintiff failed to meet her burden of establishing the requirements of Rule 23(a).

#### 1. Rule 23(a)(1) – Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

impracticable."  GRC does not contest Plaintiff's motion for class certification with respect to numerosity.

### 2.  Rule 23(a)(2)-(3) – Commonality and Typicality

Rule 23(a) requires the existence of at least one question of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  The putative class members' "claims must depend on a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.

The Supreme Court has observed that Rule 23(a)(2)'s commonality requirement "is easy to misread, since any competently crafted class complaint literally raises common questions."  *Dukes*, 131 S.Ct. at 2551.  It "is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers" that is pertinent to the certification issue.  *Id.*

In support of her claim that Rule 23(a)'s commonality requirement has been met, Plaintiff asserts that various common questions exist, but offers little support for the proposition that class-wide evidence exists that will resolve these questions in one stroke.  To the contrary, and as discussed in more detail *infra*, the evidence necessary to resolve the question of whether the requested relief is appropriate (*e.g.*, whether individuals must be excluded from the classes based on claim preclusion or collateral attack grounds, whether proposed class members paid collection costs to someone other than GRC, and whether a proposed class member's debt is a "consumer" debt) varies and is not susceptible to common proof.

While the proposed class definitions raise common questions, they lack the capacity to generate common answers. As a result, Plaintiff fails to satisfy Rule 23's commonality requirement.

### 3. Rule 23(a)(3) – Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Typicality "tends to merge" with commonality because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Young*, 693 F.3d at 542 (quoting *Dukes*, 131 S. Ct. at 2551 n.5).

As discussed in more detail in section IV(A)(2) *infra*, it is the standard practice of the OAG to refer accounts to special counsel after they are recalled from GRC and, as a result, it is likely that a number of the putative class members have had a judgment entered against them that included the collection costs that GRC attempted to collect.  If a class is certified that includes those individuals against whom a judgment was entered, GRC will have unique defenses as to the class members, which could become a major focus of this litigation—defenses based on claim preclusion and the collateral attack doctrine.  Because Plaintiff is not subject to those unique defenses, her interest in defending against them is not aligned with the interests of those class members for whom those defenses are applicable.  As a result, Plaintiff has failed to satisfy the typicality requirement of Rule 23(a).

### 4. Rule 23(a)(4) – Adequacy of Representation

Rule 23(a)(4) allows a class to be certified only if "the representative parties will fairly and adequately protect the interests of the class."  This requirement is directed at "concerns about the

competency of class counsel and conflicts of interest" between the class and its representatives. *Dukes*, 564 U.S. at 349 n.5. This is an essential prerequisite for due process, as a final judgment in a class action binds all class members. *In re Am. Med. Sys., Inc*., 75 F.3d 1069, 1083 (6th Cir. 1996). The Sixth Circuit considers two criteria for determining adequacy of representation: (1) the representatives have common interests with the unnamed members of the class, and (2) the representatives will vigorously prosecute the interests of the class through qualified counsel. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559-60 (6th Cir. 2007).

Regarding the first of the criteria considered by the Sixth Circuit (and, as discussed *infra*), Plaintiff's interests may not be aligned with those of the class members to the extent a class is certified that includes individuals subject to the unique defenses of claim preclusion and under the collateral attack doctrine. As to the latter criteria, Plaintiff has failed to demonstrate that she will prosecute the interests of the class through qualified counsel.

Plaintiff's father, Matthew J. Thompson, is a partner of the law firm she proposes to serve as class counsel. (*See* Pl.'s Mot. for Class Cert. Ex. I; Deposition of Rachel Thompson dated June 28, 2019 ("Thompson Depo.") 29:18-23.) Matthew J. Thompson is also a witness in this case. (*See* Pl.'s Mot. for Class Cert. Ex. H; Thompson Depo. 35:16-19.) The fee-shifting nature of claims under the FDCPA makes it abundantly clear that the relationship between Plaintiff and class counsel, and the resulting potential conflicts of interest, disqualifies Plaintiff from serving as an adequate representative and Plaintiff's counsel from representing the proposed classes. *See Eubank v. Pella Corp.*, 753 F.3d 718, 722, 723-24 (7th Cir. 2014) (reversing certification of a class where there was a familial relationship between the putative class representative and class counsel, noting that the relationship created a grave conflict of interests); *London v. Wal–Mart Stores, Inc.*, 340 F.3d 1246, 1254–55 (11th Cir. 2003) (reversing an order certifying a class action based, in

12

part, on its conclusion that the named plaintiff could not adequately serve as class representative because of his close personal and financial ties to plaintiffs' counsel); *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102 (5th Cir.1978) (noting that an attorney whose fees will depend on the outcome of the case, and who is also a class member or closely related to a class member, cannot serve the interests of the class with the same unswerving devotion as an attorney who has no interest other the representing the class members); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 89-91 (7th Cir. 1977) (affirming two denials of class certification due to close relationships between class counsel and named plaintiffs); *see also Gordon v. Caribbean Cruise Line, Inc.*, 2019 U.S. Dist. LEXIS 20604 (N.D. Ill. Feb. 8, 2019) (denying class certification on the basis that Plaintiff could not be an adequate class representative because of his significant business and personal ties to class counsel); *David v. Credit Bureau of the South*, 908 F.3d 972, 979 (5th Cir. 2018) (noting that attorney involved with communication upon which FDCPA lawsuit was based "arguably made him a fact witness, potentially disqualifying him from representing [the plaintiff]"); *McCarty v. Allen L. Adkins & Assocs.*, PC, 3:12-CV-3852 (N.D. Tex. Feb. 20, 2013) (disqualifying an attorney from representing the plaintiff because the attorney was directly involved in the event that prompted the FDCPA suit [a phone call to the debt collector], making him a material witness to the facts underlying the suit); *Drimmer v. WD–40 Company*, 343 Fed. Appx. 219 (9th Cir. 2009) (affirming district court's order that named plaintiff would not be an adequate class representative based on the combination of his personal relationship and landlord-tenant relationship with class counsel); *Martz v. PNC Bank, N.A.*, Civil Action No. 06-1075, 2007 WL 2343800 (W.D. Pa. Aug. 15, 2007) (holding that the named plaintiff would not be an adequate class representative because of his long standing close friendship with class counsel and the uncertainty of whether the plaintiff was actually a member of the proposed class); *Mowry v. JP Morgan Chase Bank, N.A.*, 2007 U.S.

Dist. LEXIS 44222, *8-13 (N.D. Ill. 2007) (neither the brother, nor the former roommate, of class counsel could adequately serve as a class representative).

Plaintiff's father's abstention from filing an appearance in this matter does not resolve these conflicts of interest.  *See Wexler v. AT & T Corp*., 323 F.R.D. 128, 131 (E.D.N.Y. 2018) (granting a motion to strike class allegations where the putative class representative's husband was among the attorneys who commenced the case, even though the class representative's husband withdrew one month after filing the case); *Langendorf v. Skinnygirl Cocktails, LLC*, 2014 U.S. Dist. LEXIS 154444 (N.D. Ill. Oct. 30, 2014) (denying class certification where the putative class representative's father was co-counsel with class counsel in prior cases).  Plaintiff's father still has a vested interest in the compensation sought by class counsel in this matter, as he is a partner at the firm employing them.  The close relationship between Plaintiff and her father likewise provides her an incentive to seek generous compensation for class counsel.  At the very least, this relationship nullifies Plaintiff's ability to "act as a foil to self-dealing by class counsel."  *See Wexler*, 323 F.R.D. at 130.

Because Plaintiff has an interest in the fee award sought by class counsel, she cannot adequately represent the proposed classes and her motion for class certification must be denied.

**C.**     **Plaintiff failed to meet her burden of establishing the requirements of Rule 23(b)(3).**

When certification is sought under Rule 23(b)(3), the proponent must also show: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members and (2) a class action is a superior to other available methods of resolving the controversy.  Plaintiff has failed to make either showing.

**1.  Individual questions predominate over common issues.**

In addition to the Rule 23(a) requirements of commonality and typicality, Rule 23(b) sets

forth the related requirement of "predominance," which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Though there is considerable overlap between commonality, typicality, and predominance, the latter requirement is far more demanding. *Id*. "To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (internal quotation marks and citations omitted).

Individualized issues will predominate over common questions if the classes proposed by Plaintiff are certified in this case. As discussed in more detail in section IV(A)(2) *infra*, it is the standard practice of the OAG to refer accounts to special counsel after they are recalled from GRC and, as a result, it is likely that a number of the putative class members have had a judgment entered against them that included the collection costs that GRC attempted to collect. As noted previously, if a class that includes those individuals against whom a judgment was entered is certified, GRC will have unique defenses as to those class members, which will become a major focus of this litigation. Only after performing such an extensive analysis of the circumstances surrounding each putative class member's debt could the Court determine whether an individual is properly included in the proposed classes. Plaintiff proffers no evidence that the information necessary to perform this analysis is readily available. To the contrary, the OAG suggests that determining whether an individual must be excluded as a class member would take tens of thousands of hours. (Tharp Aff. ¶ 11.) This compels the conclusion that individualized issues predominate over common ones. As a result, Plaintiff has failed to satisfy the predominance requirement of Rule 23(b).

### 2. Plaintiff has failed to demonstrate that a class action is a superior to other available methods of resolving the controversy.

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." The primary purposes of the class action mechanism are to promote efficiency and economy in litigation, to protect the interests of absentee class members, and to avoid multiple lawsuits. *See Crown v. Parker*, 462 U.S. 345 (1983). These purposes are frustrated when identification of class members requires individualized inquiry or a series of mini-trials, as would be required in this matter.

Plaintiff suggests that a class action is a superior method for adjudicating this controversy, at least in part, because the maximum amount that any party can receive under the FDCPA is relatively small, and thus the interests of the class members in individually controlling the prosecution of their claims is small. (Pl.'s Memo. in Supp. of Mot. for Class Cert. at 30.) However, "[p]recedent teaches that the availability of statutory damages plus the ability to recover attorneys' fees and costs provides substantial incentives to bring meritorious individual suits." *Hyderi v. Wash. Mut. Bk., FA*, 235 F.R.D. 390, 404 (N.D. Ill. 2006) (discussing the Real Estate Settlement Procedures Act which, like FDCPA, provides for individual statutory damages of $1,000). "Congress was obviously attuned to the potential for negative value suits, took meaningful steps to provide incentives for plaintiffs to pursue winning claims, and those incentives are material when assessing whether class treatment is superior and appropriate." *Id.*

The FDCPA's ceiling for class action damages also supports the conclusion that a class action is not the superior method for adjudicating this matter. The FDCPA limits class action damages to the lesser of $500,000 or 1 percent of the defendant's net worth. 15 U.S.C. §1692k(a)(2)(B). Plaintiff's motion for class certification is not accompanied by any evidence related to GRC's net worth. Even assuming that the class is entitled to the statutory maximum,

each class member would receive only $12.35, which is about 1 percent of the statutory damages that a plaintiff could obtain by way of an individual action. This modest recovery in combination with the substantial burden associated with identifying appropriate class members shows that a class action is not the superior method for adjudicating this matter.

## **CONCLUSION**

Rule 23 does not impose a mere pleadings standard. Certification is proper only if the trial court is satisfied, "after rigorous analysis," that the prerequisites of Rule 23 have been met. *Duke*s, 131 S.Ct. at 2551. GRC respectfully requests that the Court deny Plaintiff's motion for class certification because Plaintiff has failed to present the Court with evidence demonstrating that all requirements of Rule 23 have been satisfied.

Dated:  July 29, 2019

Respectfully submitted:

/s/Bradley R. Armstrong
Bradley R. Armstrong, MN #3935240
(admitted *pro hac vice*)
Moss & Barnett
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Tel: 612-877-5359
Fax: 612-877-5034
Bradley.Armstrong@lawmoss.com

Of Counsel:

Cors & Bassett, LLC
537 East Pete Rose Way
Suite 400
Cincinnati, Ohio 45202-3578

Kevin R. Feazell (#0059634)
537 East Pete Rose Way
Suite 400
Cincinnati, OH  45202-3578
513-852-8200 phone
513-852-8222 fax
krf@corsbassett.com

Trial Attorneys for Defendant General
Revenue Corporation

4795265v4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically using the Court's CM/ECF filing system on July 29, 2019, which will serve a copy on:

Michael B. Zieg
James E. Nobile
Nobile & Thompson Co., LPA
4876 Cemetery Rd.
Hilliard, OH 43026

Eric E. Willison
625 City Park Avenue
Columbus, OH 43206

/s/Bradley R. Armstrong
Bradley R. Armstrong

18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

RACHEL M. THOMPSON,
On Behalf of Herself and Others Similarly
Situated,

        Plaintiff,

vs.

GENERAL REVENUE CORPORATION,

        Defendant.

CASE NO.: 2:16-cv-00734-GCS-KAJ

---

### AFFIDAVIT OF DANIEL A. THARP

Daniel A. Tharp, being first duly sworn upon oath, deposes and states:

1.      I am over eighteen years of age, am not suffering from any mental disability, and am legally competent to make this affidavit.

2.      This affidavit is based on my personal knowledge and a review of my own records and those of my employer and its affiliates, including those related to related to Rachel Thompson ("Thompson") and the claims asserted in the above-captioned matter, which were made as part of our normal practice at or near the time of the occurrence of the matters recorded, and maintained in the ordinary course of business.

3.      Based upon my examination of the records relating to the above-captioned matter and my duties and responsibilities as Deputy Director of Internal Collections for the Collections Enforcement Section for the Ohio Attorney General's Office I am qualified to make this affidavit and could competently testify to the matters set forth herein, if called at trial. I know and have

1

observed that these documents and records are kept and utilized by for Ohio Attorney General's Office in the regular course of business and that the entry of information in the records of for the Ohio Attorney General's Office is made contemporaneous with transactions when they occur and that the records are true and correct.

4. Thompson incurred a debt to Columbus State Community College ("Columbus State") in 2014, in the amount of $959.00.

5. As a result of Thompson's failure to repay the debt to Columbus State, the debt was certified to the Office of the Ohio Attorney General pursuant to Ohio Rev. Code § 131.02.

6. Because the Office of the Ohio Attorney General's efforts to collect Thompson's debt were unsuccessful, the Office of the Ohio Attorney General referred the debt to General Revenue Corporation for collection on or about July 29, 2015.

7. Thompson's debt was recalled from General Revenue Corporation on or about April 25, 2016, at which point the debt remained unpaid.

8. Thompson's debt was paid and resolved on August 17, 2016, by way of a credit card payment in the amount of $1,250.98 made via the Ohio Attorney General's Office's online payment portal. The amount paid at the time consisted of a principal balance of $903.00, interest in the amount of $47.65, and collection costs in the amount of $300.33.

9. If a debt certified to the Office of the Ohio Attorney General pursuant to Ohio Rev. Code § 131.02 remains unpaid after being placed with vendors of collection agency services, such as General Revenue Corporation, a standard practice of the Office of the Ohio Attorney General is to appoint and authorize special counsel to pursue legal remedies against the debtor pursuant to Ohio Rev. Code § 109.08, including obtaining a judgment inclusive of collection costs assessed pursuant to Ohio Rev. Code §§ 109.08, 131.02.

10.     It is likely that the Office of the Ohio Attorney General appointed and authorized special counsel to pursue legal remedies, and that special counsel did ultimately obtain a judgment inclusive of interest and collection costs, with respect to some unknown number of the Putative Class Members whose debt was recalled from General Revenue Corporation prior to payment in full.

11.     Identifying those individuals who were sent or caused to be sent collections pertaining to consumer debts alleged to be owed to various entities of the State of Ohio against whom a judgment may have been obtained would be exceedingly burdensome, in terms of both time and cost. Doing so would require an individual to manually review the Office of the Ohio Attorney General's file of each individual claim including possibly locating and contacting all of the assigned special counsel to confirm whether judgment was obtained. It is estimated that such a review could take approximately fifteen to thirty minutes per claim. The Office of the Ohio Attorney General has not previously identified those claims against whom a judgment was obtained due to the burden associated and the lack of resources to do so.

FURTHER AFFIANT SAYETH NAUGHT

Name: Daniel A. Tharp
Title: Deputy Director of Internal Collections

Subscribed and sworn to before me this 19 day of July, 2019.

Notary Public

AMY J. TOMERA
Notary Public, State of Ohio
My Commission Expires 08-15-2023

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

RACHEL M. THOMPSON,
On Behalf of Herself and Others Similarly
Situated,

CASE NO.: 2:16-cv-00734-GCS-KAJ

      Plaintiff,

vs.

GENERAL REVENUE CORPORATION,

      Defendant.

## AFFIDAVIT OF ZENON BUTTS

Zenon Butts, being first duly sworn upon oath, deposes and states:

1.      I am over eighteen years of age, am not suffering from any mental disability, and am legally competent to make this affidavit.

2.      This affidavit is based on my personal knowledge and a review General Revenue's records, including those related to Rachel Thompson ("Thompson") and the claims asserted in the above-captioned matter, which were made as part of our normal practice at or near the time of the occurrence of the matters recorded, and maintained in the ordinary course of business.

3.      Based upon my examination of the records relating to the above-captioned matter and my duties and responsibilities as Vice President for General Revenue, I am qualified to make this affidavit and could competently testify to the matters set forth herein, if called at trial.  I know and have observed that these documents and records are kept and utilized by General Revenue in the regular course of business and that the entry of information in the records for General Revenue

1

is made contemporaneous with transactions when they occur and that the records are true and correct.

4.     The Office of the Ohio Attorney General ("OAG") placed a debt owed by Thompson to Columbus State Community College with General Revenue Corporation for collection on July 30, 2015.

5.     At the time the debt was placed with General Revenue Corporation for collection, the OAG represented to General Revenue Corporation that the balance of Thompson's debt was $1,416.36, which consisted of a principal balance of $959.00, interest in the amount of $18.29, and a collection costs in the amount of $439.07.

6.     Thompson's debt was recalled from General Revenue Corporation by the OAG on or about May 3, 2016, at which point the debt remained unpaid.

7.     General Revenue Corporation's records reflect that there are 40,478 individuals to whom it sent a collection letter in an effort to collect collection costs assessed by the OAG on a non-tax debt between July 27, 2015 and December 5, 2018.

8.     General Revenue Corporation does not have personal knowledge with respect to the purpose for which the aforementioned debts were incurred, aside from knowledge that most of these debts were or are owed to state colleges or universities.

9.     General Revenue Corporation's records do not reflect whether the OAG or special counsel obtained a judgment against any of these individuals after the accounts were recalled from General Revenue Corporation by the OAG.

FURTHER AFFIANT SAYETH NAUGHT

Name: Zenon Butts
Title: Vice President

Subscribed and sworn to before me
this 26th day of July, 2019.

Notary Public

JESSICA PETRIE
Notary Public, State of Ohio
My Commission Expires 09-16-2022

NOTARIAL SEAL
STATE OF OHIO

3

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF OHIO

3             EASTERN DIVISION

4        ~~~~~~~~~~~~~~~~~~~~~

5  RACHEL M. THOMPSON, on Behalf of Her elf and

6  Other  Similarly Situated,

7

8           Plaintiff,

9

10     v .        Ca e No. 2:16-cv-00734-GCS-KM

11

12  GENERAL REVENUE CORPORATION,

13

14          Defendant.

15        ~~~~~~~~~~~~~~~~~~~~~

16          Depo ition of

17         RACHEL M. THOMPSON

18

            June 28, 2019

19          11:06 a.m.

20          Taken at:

        Veritext Legal Solution

21       41 South High Street

          Columbu , OH

22

23        Rebecca William

24

25

Page 2

1 APPEARANCES:
2
3        On behalf of the Plaintiff:
4        Nobile & Thomp on Co., by
5        JAMES E. NOBILE, E q.
6        4876 Cemetery Road
7        Hilliard, OH 43026
8        Jenobile@ntlegal.com
9        614-529-8600
10       On behalf of the Defendant:
11       Mo   & Barnett, by
12       BRADLEY ARMSTRONG, E q.
13       150 South Fifth Street
14       Suite 1200
15       Minneapoli , MN 55402
16       Barm trong@lawmo  .com
17
18
19
20
21
22
23
24
25

Page 4

1            INDEX OF EXHIBITS
2 NUMBER        DESCRIPTION        MARKED
3 Exhibit 1  Packet of Document ........... 25
4 Exhibit 2  Packet of Document ........... 31
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        TRANSCRIPT INDEX
2
3 APPEARANCES.............................   2
4
5 INDEX OF EXHIBITS .......................  4
6
7
8 By Mr. Arm trong..........................   5
9
10 REPORTER'S CERTIFICATE...................   37
11
12 EXHIBIT CUSTODY
13
14 EXHIBITS RETAINED BY THE COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        RACHEL M. THOMPSON, of lawful age, called
2 for examination, a  provided by the Ohio Rule
3 of Civil Procedure, being by me fir t duly
4  worn, a  hereinafter certified, depo ed and
5  aid a  follow :
6        EXAMINATION OF RACHEL M. THOMPSON
7 BY MR. ARMSTRONG:
8    Q.   Good morning, M . Thomp on.  My
9 name i  Brad Arm trong. I am an attorney for
10 GRC.  What we're doing today i  a depo ition.
11 I'm going to give you kind of  ome rule  of the
12 road here.  We're going to be recording what'
13 happening here.  The court reporter i  going to
14 be recording,  o if you could an wer verbally,
15 that would be much appreciated.  Nod  of the
16 head, "um  " and "ah " are difficult for the
17 court reporter to tran cribe for the record.
18        If you ever are unable to
19 under tand one of my que tion  or you can't
20 hear me, ju t let me know.  I can rephra e the
21 que tion or re-a k the que tion.
22    A.   Okay.
23    Q.   If you need to take a break for
24 whatever rea on, we can certainly do that.  I'm
25 not going to keep you too long, but I will a k

2 (Page  2 - 5)

Page 6

1 that you an wer whatever que tion i
2 out tanding before we take a break. So I gue
3 we'll ju t get rolling.
4     Can you tate your full name and
5 addre for the record, plea e?
6     A.   Rachel Marie Thomp on, ████████
████████████████████████████.
8     Q.   And how long have you lived at that
9 addre ?
10    A.   I've been there ince December of
11 2016.
12    Q.   Where did you live before you were
13 living at Laird Avenue?
14    A.   I wa in Middleburg Height . That
15 wa ██████████████████████████████
██████████ -- I think -- oh, go h -- ██████, I
17 believe. It' been a while.
18    Q.   No; that' fair enough. Do you
19 recall the approximate date that you lived at
20 the Shawnee Trail addre ?
21    A.   Ye . That would have been October
22 of, let' ee, 2015. No, wait, 2014. I'm
23 orry, October 2014 through July of 2015.
24    Q.   All right. Plea e don't be
25 offended by thi , but are you on any

Page 7

1 medication or ub tance that might prevent
2 you from under tanding or re ponding to my
3 que tion today?
4     A.   No, ir.
5     Q.   Have you ever given a depo ition
6 before?
7     A.   No, ir.
8     Q.   Have you te tified a a witne in
9 any civil ca e or a criminal ca e?
10    A.   No, ir.
11    Q.   Are you married?
12    A.   No.
13    Q.   And a few more que tion , kind of
14 quizzing you on ome background tuff. Can you
15 tell me about the highe t education level that
16 you've taken part of or received a degree?
17    A.   The degree that I have currently?
18    Q.   Did you attend college, or did you
19 get a degree in college?
20    A.   Ye . I --
21    Q.   And where --
22    A.   Sorry.
23    Q.   No; that' all right. Can you tell
24 me all of the chool at which you went to
25 college for?

Page 8

1     A.   Sure. I went to Kent State from
2 2010 to 2012. I went to Columbu State in
3 2014. I attended Cuyahoga Community College in
4 2015, and I went back to Columbu State 2016
5 through 2018.
6     Q.   So did you receive your degree from
7 Columbu State?
8     A.   Ye , I did.
9     Q.   And what kind of degree did you
10 receive?
11    A.   It' an a ociate of applied
12 cience.
13    Q.   Are you currently employed?
14    A.   Ye .
15    Q.   Where are you employed?
16    A.   It' Ricart Family Chiropractic.
17 It' in Reynold burg, Ohio.
18    Q.   And what do you do there?
19    A.   I'm a licen ed ma age therapi t.
20    Q.   And when did you -- when did you
21 tart working there?
22    A.   I ju t got the job thi week, o I
23 ju t tarted there.
24    Q.   Where did you work before your
25 current place of employment? I'll re-a k the

Page 9

1 que tion.
2        Who wa your employer before your
3 current employer?
4     A.   I worked at Nationwide Children'
5 Ho pital.
6     Q.   And what did you do there?
7     A.   I wa a coffee bari ta at the cafe
8 in the ho pital.
9     Q.   And about how long were you doing
10 that?
11    A.   That wa April 2018 to November
12 2018.
13    Q.   Have you been employed el ewhere
14 ince graduating at -- from Columbu State?
15    A.   No.
16    Q.   Have you ever been a party to
17 another civil law uit?
18    A.   No.
19    Q.   Have you ever been a party in a
20 criminal proceeding?
21    A.   No.
22    Q.   All right. I'm going to move on to
23 ome of the claim in the current law uit. Can
24 you de cribe for me the claim that you've
25 a erted again t the defendant in thi matter?

3 (Page  6 - 9)

Page 10

1     A.   I claim that I -- well, I don't owe
2  the original debt at all, or any interest
3  incurred from the debt collection agency, I
4  don't owe that as well.
5     Q.   I apologize for -- there might be
6  some delay. I'm just taking notes here, so --
7     A.   Okay.
8     Q.   So with respect to the debt that
9  you claim that wasn't owed, do you know how
10 that debt was incurred?
11    A.   The original debt?
12    Q.   Yeah.
13    A.   No. To my knowledge, I do not know
14 why I had the outstanding debt.
15    Q.   Did you attend classes at Columbus
16 State during 2014?
17    A.   Yes, I did.
18    Q.   Did you pay for all of those
19 classes?
20    A.   Yes, I did.
21    Q.   Do you recall which classes you
22 were enrolled in that particular semester, in
23 the fall of 2014?
24    A.   I think four or five classes. It
25 would have been an introductory massage therapy

Page 11

1  class. I believe there was an ethics class.
2  There was an anatomy class. I don't recall the
3  other two. It's been a while. I mean, I could
4  find out technically if you really needed me to
5  go through the documentation, but --
6     Q.   That's fair enough. I completely
7  understand.
8        Did you complete all those courses
9  in the fall of 2014? Do you recall?
10    A.   I did not.
11    Q.   So the debt that the -- at Columbus
12 State in the Ohio General's claim that you owed
13 as a result of the classes in 2014, is that
14 particular debt still out standing?
15    A.   No. The debt to Columbus State has
16 been paid off.
17    Q.   And when did you pay it off?
18    A.   August 15th, 2016.
19    Q.   So if -- based on some of your
20 prior responses, you suggested -- there's a
21 suggestion that you didn't owe the debt. Why
22 did you pay the debt if you don't believe that
23 you owed it?
24    A.   Well, my attorneys had already
25 taken my case over to litigation, and it was

Page 12

1  going to be -- I mean, litigation could take --
2  could take years, and I didn't want to wait
3  that long to go back to school, and I had
4  acquired the funds to pay it off, so I did.
5     Q.   And do you recall how much you paid
6  to resolve the debt?
7     A.   Am I allowed to look at --
8        MR. NOBILE: Can you recall without
9  looking at anything?
10    A.   Yeah, like $1,200, I think, around
11 there. I don't know the exact number without
12 looking, but $1,200.
13    Q.   And did that amount include any
14 collection costs?
15    A.   Yes. I mean, that was more than
16 what the original debt was, yes.
17    Q.   What did you do to prepare for
18 providing your deposition testimony today?
19    A.   I went over the deposition
20 questions with my lawyer and then went over
21 them as well in private by myself. Excuse me.
22        MR. NOBILE: I think he meant the
23 interrogatories -- the discovery requests, I
24 think is what he is referring to. Not the
25 deposition questions, unless --

Page 13

1     A.   No; I don't know anything you're
2  going to ask me. That's not what I meant.
3     Q.   Well, that's good because if you
4  have questions written down, you know more than
5  I do.
6        Did you review -- I guess it may
7  have been answered in part by your attorney.
8  But can you tell me the documents that you
9  reviewed in preparation for today's deposition?
10    A.   It's whatever documentation he
11 e-mailed me. Did you say it was called
12 discovery?
13        MR. NOBILE: Yeah, it' --
14    A.   Okay. It was my Objection and
15 Response to the Defendant's First Set of
16 Interrogatories to the Plaintiff. Say that
17 three times fast.
18    Q.   Have you discussed this case with
19 anyone beside your attorneys?
20    A.   No.
21    Q.   When was the first time that you
22 met with your attorneys with respect to the
23 claims asserted in this lawsuit?
24    A.   Probably in October sometime. I
25 mean, I gave retention in December 22nd of --

4 (Pages 10 - 13)

Page 14

1 that would have been 2015. It would have been
2 right after I received the letter in October of
3 2014.
4     Q.    So did you sign a retainer
5 agreement with your attorney?
6     A.    Yes, I did.
7     Q.    And when did you sign that?
8     A.    That would be December 22nd, I
9 believe, of 2015.
10     Q.    And I'll preface this by saying
11 that I'm not -- none of the next few questions
12 are seeking to know what you said or what your
13 attorney have said to -- or exchanged with
14 regard to this matter. I'm just asking kind of
15 -- some date and related factual information,
16 so if anything is unclear, don't hesitate to
17 let me know before you provide a response.
18         Approximately how many times have
19 you spoken with your attorney about this case?
20     A.    In person or in general?
21     Q.    We'll start with total.
22     A.    I would say 10 to 15 times.
23     Q.    And how many times have you
24 discussed it in person?
25     A.    I would say about five.

Page 15

1     Q.    And can you tell me the names of
2 the attorney that you've spoken with in person
3 with respect to this law suit?
4     A.    Jim Nobile and Eric Wilson.
5     Q.    When did you first discuss this
6 matter with Jim Nobile or Eric Wilson?
7     A.    It would have been sometime shortly
8 after I received the letter from Columbus State
9 in October of 2014.
10     Q.    When you received the letter from
11 Columbus State in or around October 2014, what
12 -- how did you respond to it?
13     A.    I didn't understand it, and I
14 thought that someone from a legal standpoint
15 would understand it better than I did and I
16 presented it to them.
17     Q.    So did that letter from Columbus
18 State request the collection cost that you're
19 complaining of now?
20     A.    The original collection cost or --
21 I'm sorry; I don't understand.
22     Q.    Well, you told -- and correct me if
23 I'm wrong -- but your previous testimony was
24 that you retained a lawyer after you received
25 the letter from Columbus State in October 2014,

Page 16

1 so I'm just trying to figure out what it was
2 about that letter that caused you to retain an
3 attorney or what about that letter you didn't
4 understand.
5         So can you tell me what -- or do
6 you recall what the balance was that was sought
7 by that October 2014, letter?
8     A.    It was $959 -- or $900- -- yeah,
9 $959, I believe.
10     Q.    And did that letter seek any
11 additional interest or collection cost?
12     A.    No, not at the time.
13     Q.    So what about the request for $959
14 was so concerning that you thought that you
15 needed legal counsel?
16     A.    I didn't understand why I had the
17 debt to begin with.
18     Q.    Did you contact Columbus State
19 about why the debt existed?
20     A.    I honestly don't remember. I might
21 have, but I do not recall.
22     Q.    Do you know what -- did you receive
23 any additional letters with respect to the
24 debt?
25     A.    I believe so. I'm trying to -- I'm

Page 17

1 not sure if I received another one from
2 Columbus State before I received my first one
3 from the Ohio Attorney General.
4     Q.    Okay. And that' kind of where I
5 was going. So you received a letter from the
6 Ohio Attorney General concerning the same debt?
7     A.    Correct.
8     Q.    And do you recall the amount of
9 money that the Ohio Attorney General claimed
10 that you owed?
11     A.    Not the exact amount, but I believe
12 it was more than what Columbus State had
13 indicated in their first letter.
14     Q.    So do you recall whether it
15 included interest?
16     A.    I believe so, yes.
17     Q.    Did it also indicate that you owed
18 collection cost?
19     A.    Yes, I believe so.
20     Q.    And how did you respond to that
21 letter?
22     A.    I did not respond to them directly.
23 I gave that letter to my attorney as well.
24     Q.    Do you know whether your attorney
25 responded to that letter?

5 (Page 14 - 17)

Page 18

1    A.   Ye , they did.
2    Q.   So the letter from the Ohio
3 Attorney General wa  ent to you, or wa  it
4  ent to your attorney --
5    A.   The fir t one wa  ent to me.
6    Q.   And then wa  the next letter you
7 received the letter from General Revenue
8 Corporation?
9    A.   Directly to me?
10   Q.   Well,  trike that que tion.  How
11 about -- did you receive any letter  from
12 anybody el e with re pect to debt after you
13 received the letter from the Ohio Attorney
14 General?
15   A.   To me?  Directly to me?
16   Q.   Ye .
17   A.   Ye .
18   Q.   And who did you receive a letter
19 from?
20   A.   The debt collection agency that i
21 inquiring for the collection at thi  time.
22   Q.   Do you know what the name of that
23 collection agency i ?
24   A.   I actually don't.  I don't think
25 I --

Page 19

1    Q.   I  that --
2    A.   Sorry.
3    Q.   Did that letter that you received
4 from the collection agency  eek collection
5 co t ?
6    A.   Ye .
7    Q.   Did it  eek intere t?
8    A.   Ye .
9    Q.   Do you recall whether tho e were
10 the  ame amount  that were  ought by the letter
11 that you received from the Ohio Attorney
12 General?
13   A.   I believe the amount wa  more,
14 higher.
15   Q.   Do you know how much more?
16   A.   A few hundred dollar , $300, $400.
17   Q.   Do you know whether thi  law uit i
18 filed a a cla   action law uit?
19   A.   I'm  orry?  I didn't --
20   Q.   Do you know whether thi  law uit i
21 filed a a cla   action law uit?
22   A.   Ye , I believe it i .
23   Q.   Can you de cribe for me your
24 under tanding of what a cla   action law uit
25 i ?

Page 20

1    A.   A cla   action law uit i  omething
2 that -- I believe it -- I don't know if it'  on
3 the federal level or not, but it i  a
4 repre entation for a large group of people.
5    Q.   Do you know whether there'  a cla
6 repre entative in thi  ca e?
7    A.   Ye .
8    Q.   I  there a cla   repre entative?
9    A.   Ye .
10   Q.   Who i  that?
11   A.   Me.
12   Q.   Can you de cribe for me your
13 under tanding of the role of the cla   action
14 repre entative in a cla   action law uit?
15   A.   To my knowledge, I'm the
16 repre entative ca e for the foundation of the
17 law uit and any other law uit  -- or any other
18 ca e brought in together with the law uit,
19 would be reflective of mine or  imilar to it.
20   Q.   What do you think that you're
21 entitled to recover individually with re pect
22 to thi  law uit?
23   A.   The entire debt that I paid to
24 Columbu  State, money for traveling back and
25 forth to my lawyer ' office, and  ome type of

Page 21

1 compen ation for the emotional  tre  and toll
2 that it'  taken on me over the la t few year .
3    Q.   Can you de cribe for me a little
4 bit about the emotional di tre   that you have
5 experienced?
6    A.   Sure.  I planned to go back to
7  chool in the  pring of '15 to continue my
8 degree at Columbu  State, and I wa  not able to
9 do,  o -- becau e of the out tanding debt.  So
10 it put off my education even further.
11        I had extreme anxiety about trying
12 to pay off the debt.  I had health i  ue with
13 my anxiety that wa  induced from the ca e.  I
14 wa n't able to  tart up my  chooling until
15 Augu t of 2016, becau e of thi  debt.  So it
16 not only wa ted my time, but it al o cau ed me
17 pretty  ignificant health i  ue  that
18 influenced my per onal life, my family life, my
19 work environment, that type of thing.
20   Q.   What type of health i  ue  did you
21 experience?
22   A.   I had -- well, I do  till have, but
23  tarting then, I have generalized anxiety
24 di order.  It cau e  tre  ,  leep problem ,
25 panic attack , anxiety attack  that come with

1 breathing problems, heart palpitations,
2 depression.
3    Q.   Have you seen a medical
4 professional with regard to those issues that
5 you just described?
6    A.   No.
7    Q.   Has any professional diagnosed you
8 with an anxiety disorder?
9    A.   No.
10    Q.   Have you seen a medical
11 professional at all since October 2014?
12    A.   For the anxiety?
13    Q.   For anything.
14    A.   Yes.
15    Q.   Did you discuss your anxiety or
16 other health issue that you just described
17 with a medical professional at any of those
18 visits?
19    A.   Possibly, yes.
20    Q.   Can you tell me the names of the
21 medical professionals, or, you know, if it's a
22 doctor's office, the name of the doctor's
23 office, that you visited since October 2014?
24    A.   I'm trying to think. I'm sorry. I
25 don't have a current family practitioner, but I

1 did back in 2014, 2015. That was in the
2 Cleveland area. His name was Dr. Baranowski.
3 I don't recall his first name. I went there to
4 get medical help with my fibromyalgia.
5    Q.   When were you diagnosed with
6 fibromyalgia?
7    A.   Spring of 2012, I believe.
8    Q.   Are you taking medication for
9 fibromyalgia?
10    A.   Not currently, no.
11    Q.   Do you take any medication that --
12 have you taken any medication for fibromyalgia
13 since October 2014?
14    A.   Yes.
15    Q.   What type of medication have you
16 taken since October 2014?
17    A.   It was the generic version of
18 Cymbalta, and I believe it was 60 milligrams
19 once a day.
20    Q.   And do you recall the time period
21 that you used the generic version of Cymbalta?
22    A.   Yes. That would have been 20- -- I
23 think December 2015 to November of 2015.
24    Q.   I think you said -- correct me if
25 I'm wrong -- I think you said December of 2015

1 to November of '15. I one of those year off?
2    A.   December of 2015 to the next
3 November.
4        MR. NOBILE:  2016.
5    Q.   So it would be November of 2016?
6    A.   Oh, yes. I'm sorry. Yes. Sorry.
7    Q.   All right. So December 2015 to
8 November 2016?
9    A.   Correct.
10    Q.   All right. Stepping back for a
11 second. Can you describe for me what you
12 thought you were entitled to recover
13 individually, and tell me what it is that the
14 class entitled to recover as a whole in this
15 case?
16    A.   I don't know that that's my place
17 to say, but whatever debt that they have
18 incurred and whatever they feel individually.
19    Q.   How much time do you think that
20 you've devoted to this case since it was filed?
21    A.   Like in hours?
22    Q.   Yes, please.
23    A.   I don't know. Over 50 hours, I
24 guess.
25        MR. ARMSTRONG:  Madam court

1 reporter, as I understand it, you guys have
2 some documents printed out for me as exhibits;
3 is that correct?
4        THE REPORTER:  Yes.
5        MR. ARMSTRONG:  After it's been
6 marked, if you wouldn't mind providing it
7 to Ms. Thompson.
8        - - - - -
9        (Thereupon, Deposition Exhibit 1,
10        Packet of Documents, was marked for
11        purposes of identification.)
12        - - - - -
13    Q.   And, Ms. Thompson, if you could
14 just take however much time you need, but page
15 through the documents, and I'll kind of go
16 through it and ask you some questions. Just
17 let me know when you're ready.
18    A.   Okay.
19        MR. NOBILE:  And, Brad, just to be
20 clear, what's been marked as Exhibit 1, the
21 front page is a Columbus State letter, and
22 underneath it is, you know, it looks like 15 or
23 so other papers.
24    Q.   Yeah. So this exhibit is to
25 consist of the documents produced in response

Page 26

1 to my client' di covery reque t . So I'll a k
2 que tion individually, and you can take time
3 when I a k individual que tion to review
4 thing .
5          MR. NOBILE: Sure. I ju t wanted
6 to make ure we were looking at the correct
7 thing. Okay.
8          MR. ARMSTRONG: Thank .
9     A.   Okay. I'm ready.
10    Q.   All right. So I'm going to tart
11 with Page 2 of thi document, which i a letter
12 dated December 15, 2014. Do you recall
13 receiving thi letter?
14    A.   Ye , I do.
15    Q.   Page 2 of the letter, it ay that
16 the account that the Ohio Attorney General i
17 eeking to collect con i ted of a debt in the
18 amount of $959, intere t in the amount of $.39,
19 fee in the amount of $106.57, for a total of
20 $1,065.96. Which, if any, of the e amount did
21 you di pute?
22    A.   All of it.
23    Q.   All of it? So the claim in thi
24 matter are that the collection co t were
25 exce ive. What would have been an amount of

Page 27

1 collection co t, with re pect to thi letter a
2 of the date thi letter wa ent, that wouldn't
3 have been accepted?
4          MR. NOBILE: Objection a to form
5 and peculation, but you can an wer, if you
6 would like.
7     A.   No collection amount or intere t
8 would have been okay.
9     Q.   Okay. I that becau e you di puted
10 the debt generally?
11    A.   Ye .
12    Q.   So would it be accurate to ay that
13 you don't think any collection co t were owed
14 becau e you didn't owe any debt at all?
15    A.   Ye .
16    Q.   I am going to a k you a que tion
17 about -- well, it' Bate tamped a
18 Plaintiff' di covery re pon e 000009.
19    A.   Okay.
20    Q.   Do you recall receiving thi
21 letter?
22    A.   Ye .
23    Q.   And on Page 2 of the letter, it
24 began kind of itemized a the amount that'
25 being ought. It ay , "Principle bound of

Page 28

1 $959, intere t owed $18.37, and current
2 collection co t balance of $439.07. Would it
3 be accurate to tate that you di puted all
4 three of tho e amount with re pect to thi
5 letter a well?
6     A.   Ye .
7     Q.   Would it be accurate to ay that
8 you, at thi time, would have contended that no
9 collection co t would have been owing becau e
10 you didn't owe the $959 principle debt?
11    A.   Ye , correct.
12    Q.   All right. I am going to move on
13 to another page in thi exhibit that'
14 Plaintiff' Di covery Re pon e 000015.
15    A.   Okay.
16    Q.   Have you een thi document before?
17    A.   Ye .
18    Q.   I that your ignature at the
19 bottom of thi page?
20    A.   Ye , it i .
21    Q.   Do you recall who you provided thi
22 document to?
23    A.   My attorney.
24    Q.   I'm going to move back a couple of
25 page to Plaintiff' di covery re pon e 000011.

Page 29

1     A.   Ye .
2     Q.   Now, that la t document that we
3 were di cu ing, you aid you provided that to
4 your attorney. Would the individual who igned
5 thi letter on Plaintiff' di covery re pon e
6 000011, wa that the attorney that you provided
7 that to?
8     A.   The phy ical document? Like after
9 I igned it?
10    Q.   Correct.
11    A.   No. I mean, that i the ame
12 ignature on the paper you're referring to, but
13 who I phy ically handed the paper to?
14    Q.   Did you provide -- i that the
15 attorney that you aid that you provided that
16 relea e to?
17    A.   Ye , I uppo e, yeah.
18    Q.   Okay. And do you have any relation
19 to Matthew J. Thomp on?
20    A.   Ye , I do.
21    Q.   And can you de cribe what your
22 relation hip with Matthew J. Thomp on i ?
23    A.   He' my father.
24    Q.   Turning to Plaintiff' di covery
25 re pon e 000018.

8 (Page 26 - 29)

Page 30

1    A.   Ye .
2    Q.   Thi  may be the  ame letter that we
3  di cu ed previou ly. In any event, on Page 2
4  of the letter, it itemize  the balance of debt
5   ought. Do you  ee that?
6    A.   I'm  orry, what -- ye , I do. I
7   ee it.
8    Q.   Okay. So what amount of collection
9  co t  would have needed to be  tated in thi
10  letter for you to believe that it would have
11  complied with the law?
12         MR. NOBILE: Objection; call  for a
13  legal conclu ion. You can an wer.
14    A.   I'm good.
15    Q.   So you're not going to an wer that
16  que tion?
17    A.   No.
18    Q.   So the total amount  tated in thi
19  letter wa  $1,416.44. I  that the amount that
20  you paid that re olved the debt in 2016?
21    A.   No.
22    Q.   Did you pay any le   than that to
23  re olve the debt?
24    A.   Did I what? I'm  orry.
25    Q.   Did you pay le   than that amount

Page 31

1  to re olve the debt?
2    A.   Ye , I did.
3    Q.   Did you negotiate the balance of
4  the debt with anyone to get it re olved for a
5  le er amount?
6    A.   No, I did not.
7    Q.   Do you recall how you went about
8  paying that debt?
9    A.   I paid through my attorney  and
10  then paid them back.
11    Q.   And did the amount of the debt --
12  did the amount you paid to re olve the debt
13  exceed $959?
14    A.   Ye , it did.
15           - - - - -
16         (Thereupon, Depo ition Exhibit 2,
17  Packet of Document , wa  marked for
18  purpo e  of identification.)
19           - - - - -
20    Q.   M . Thomp on, thi  will be the  ame
21  proce . I'll give you whatever time you want
22  to look at it now, and I'll a k you que tion
23  about  everal page  in the document, and you
24  can certainly take more time when we -- when I
25  go through the que tion . So if you ju t want

Page 32

1  to take a look at it and let me know when
2  you're ready for me to a k a few que tion .
3    A.   Okay.
4    Q.   M . Thomp on, I  hould probably  ay
5  that I only have a couple of que tion  about
6  maybe the fir t ten page  of the document,
7   o --
8    A.   Oh, okay. I'm ready.
9    Q.   I wouldn't  ugge t that you -- and
10  I don't want to hurry you along. You can take
11  a  much time a  you need.
12    A.   No, you're fine. I've  een it
13  before,  o --
14    Q.   Okay. So that'  kind of a duck
15  tail to my fir t que tion. Can you de cribe
16  for me what thi  document i ?
17    A.   Thi  wa  a document that I an wered
18  que tion  with my lawyer, face-to-face
19  que tion  that the defendant had for me.
20    Q.   Sure. Do you recall when you did
21  that? The date on which you did that,
22  approximately?
23    A.   I don't know. Thi  would have been
24  a few month  ago, couple month  ago.
25    Q.   So my fir t que tion pertain  to

Page 33

1  Page 6,  o it'  a re pon e to Interrogatory No.
2  4.
3    A.   Yep.
4    Q.   So the re pon e to Interrogatory
5  No. 4  ay  that you received a refund of $837
6  -- excu e me, $800.37 from Columbu  State
7  Community College at  ome point in the fall
8   eme ter of 2014. Do you agree that that'
9  kind of what the re pon e to No. 4  ugge t ?
10    A.   Ye .
11    Q.   So in the fall of 2014, did you --
12  did you pay any of the tuition out of -- out of
13  your own pocket?
14    A.   No.
15    Q.   So did you obtain loan  to pay for
16  all of the cla e ?
17    A.   I had loan  and PELL grant .
18    Q.   So when you received a refund check
19  in the amount of $800.37, what did you do with
20  that check?
21    A.   That wa  u ed for ga  to get to and
22  from  chool and to and from -- from Columbu  to
23  Cleveland, becau e I wa  in a long di tance
24  relation hip at the time.
25    Q.   Okay. Do you know -- who did you

Page 34

1 receive that refund check from?
2     A.   Columbu State.
3     Q.   Did you ever inquire about why you
4 were getting a refund if you didn't pay any of
5 the tuition out of pocket?
6     A.   No.
7     Q.   Did you ever inquire with Columbu
8 State about what the balance wa in your
9 account?
10     A.   On my account in --
11     Q.   In October or -- I'll rephra e
12 that.
13         Did you ever inquire with Columbu
14 State about the balance on your account with
15 re pect to the fall 2014 eme ter?
16     A.   After I received the refund?
17     Q.   Sure. Ye .
18     A.   No.
19     Q.   After you received the refund?
20     A.   No.
21     Q.   And you indicted that you didn't
22 complete the cla e that you regi tered for in
23 the fall of 2014; i that accurate?
24     A.   That' correct.
25     Q.   Did you -- do you know whether you

Page 35

1 received the check before or after you had
2 unenrolled, or, you know, topped attending
3 cla e that eme ter?
4     A.   I believe I received the refund
5 check before I withdrew from cla e .
6     Q.   Okay. Ju t kind of backtracking a
7 little bit about the timeline here. You fir t
8  tarted receiving letter from Columbu State
9 with re pect to the debt in October of 2014; i
10 that accurate?
11     A.   That' correct.
12     Q.   When do you think that you fir t
13 di cu ed thi particular debt with your father
14 after that October 2014, letter?
15     A.   Within the ame week.
16     Q.   How many time do you think that
17 you di cu ed the letter with him in the ix
18 month following October of 2014?
19     A.   Two, three time , maybe.
20     Q.   I don't have any more que tion for
21 you, M . Thomp on.
22     A.   Thank you o much.
23     Q.   Thank you.
24         MR. NOBILE:  We'll waive.
25         (Depo ition concluded at 12:04 p.m.)

Page 36

1     Whereupon, coun el wa reque ted to give
2 in truction regarding the witne ' review of
3 the tran cript pur uant to the Civil Rule .
4
5         SIGNATURE:
6 It wa agreed by and between coun el and the
7 partie that the reading and igning of the
8 tran cript of aid depo ition, be and the ame
9 i hereby waived.
10
11         TRANSCRIPT DELIVERY:
12 Coun el wa reque ted to give in truction
13 regarding delivery date of tran cript.
14         Mr. Arm trong, Original, Regular
15
16
17
18
19
20
21
22
23
24
25

Page 37

1         REPORTER'S CERTIFICATE
2 The State of Ohio,  )
3                 SS:
4 County of Franklin. )
5
6         I, Rebecca William , a Notary
7 Public within and for the State of Ohio, duly
8 commi ioned and qualified, do hereby certify
9 that the within named witne , RACHEL M.
10 THOMPSON, wa by me fir t duly worn to te tify
11 the truth, the whole truth and nothing but the
12 truth in the cau e afore aid; that the
13 te timony then given by the above-referenced
14 witne wa by me reduced to tenotypy in the
15 pre ence of aid witne ; afterward
16 tran cribed, and that the foregoing i a true
17 and correct tran cription of the te timony o
18 given by the above-referenced witne .
19         I do further certify that thi
20 depo ition wa taken at the time and place in
21 the foregoing caption pecified and wa
22 completed without adjournment.
23
24
25

Page 38

1      I do further certify that I am not

2  a relative, coun el or attorney for either

3  party, or otherwi e intere ted in the event of

4  thi  action.

5      IN WITNESS WHEREOF, I have hereunto

6  et my hand and affixed my  eal of office at

7  Cleveland, Ohio, on thi  19th day of

8  July, 2014.

9

10

11

12



13

14    Rebecca William , Notary Public

15    within and for the State of Ohio

16

17 My commi   ion expire  June 7, 2022.

18

19

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.